**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESUS O. HALL, | : | CIVIL ACTION NO. **1:CV-10-1172** |
| | : | |
| Plaintiff | : | (Chief Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| J. KOEHN, | : | |
| | : | |
| | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

**I. Background.**

On June 2, 2010, Plaintiff, Jesus O. Hall, an inmate currenlty confined at the United

States Penitentiary at Lewisburg, Lewisburg, Pennsylvania ("USP-Lewisburg"), filed, pro se, a

*Bivens*[1] civil rights action pursuant to 28 U.S.C. § 1331.  (Doc. 1). Plaintiff was previously

confined at USP-Canaan and his instant action relates to his confinement at USP-Canaan.

Plaintiff attached several exhibits to his  Complaint, including his Affidavit, Ex. A-5.  Plaintiff

also filed a motion to proceed *in forma pauperis*.  (Doc. 2).  Plaintiff named only USP-

Canaan Case Manager ("CSW") Jamey Koehn as a Defendant.  Plaintiff alleged that on

March 14, 2009, he placed his hands in the food slot of his Special Housing Unit ("SHU")

---

[1]*Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 91 S.Ct.
1999 (1971).   Plaintiff's action  falls within 28 U.S.C. § 1331 ("The district courts shall have
original jurisdiction of <u>all</u> civil actions arising under the Constitution, laws or treaties of the
United States." (Emphasis added)).
    This is a *Bivens* action since Plaintiff seeks monetary damages from a federal official for
an alleged violation of his constitutional rights. *See Oriakhi v. Wood*, 2006 WL 859543, * 1, n. 1
(M.D. Pa.); *Conway v. Lindsay*, 2009 WL 1956282 (M.D. Pa.).  (Doc. 1, p. 1).

cell to prevent its closing as a way to protest lack of access to the law library and something

that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to

the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was

holding his slot open and that he then put his arm into the slot with his hands on the metal

wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and

"intentionally slammed the wicket from the outside and pressed her weight onto it to inflict

further injury."  (Doc. 1, p. 3).  As a result of Defendant's conduct, Plaintiff averred that his

fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical

attention and then she "left the range and stood at the gate laughing with other officer."  *Id*.

at 4.  Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical

attention until approximately seven (7) hours later.

Plaintiff claimed that Defendant violated his Eighth Amendment rights by slamming

the food tray slot door on his left hand.  As relief, Plaintiff requested "the court to charge

[Defendant] J. Koehn with assault."  (Doc. 1, p. 5).  Plaintiff also requested compensatory

and punitive damages, as well as damages for "mental and emotional injury."  *Id*.

Thus, we construed Plaintiff as raising an Eighth Amendment excessive force claim against

Defendant Koehn.

On June 8, 2010, Plaintiff was granted *in forma pauperis* status, and the Clerk of

Court was directed to issue the Summons and the U.S. Marshal was directed to serve

Defendant.  (Doc. 8).  Defendant was served with Plaintiff's Complaint, and after being

granted an extension of time to respond to it, on September 15, 2010, she filed a Motion to

Dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for Summary Judgment pursuant to Fed. R. Civ. P. 56(b).  (Doc. 16).

On March 23, 2011, Plaintiff also filed a Motion for Stay/Continuance under Rule 56(f) (Doc. 44).  We found that Plaintiff's Doc. 44 Motion was moot, and we dismissed it as such on June 9, 2011.  (Doc. 51).

On June 7, 2011, the District Court issued a Memorandum and Order (Doc. 50) and dismissed with prejudice Plaintiff's claim for monetary damages against Defendant in her official capacity.  The Court denied Defendant's Motion to Dismiss Plaintiff's Complaint or, in the alternative, for Summary Judgment since it found that Plaintiff's claim was notbarred by the *Heck* favorable termination rule[2] due to the fact that Plaintiff was serving a life imprisonment sentence with no parole.   The Court directed Defendant to respond to Plaintiff's Complaint within thirty days.

On July 7, 2011, Defendant filed her Answer to Plaintiff's Complaint with Affirmative Defenses.  (Doc. 53).  Subsequently, we allotted the parties time for discovery in this case. On August 30, 2011, we issued a Scheduling Order setting the discovery deadline as October 29, 2011, and the dispositive motion deadline as December 29, 2011.  (Doc. 67).

On September 21, 2011, Plaintiff filed 3-page Motion to Compel Defendant to respond to his Second Request for Production of Documents pursuant to Fed.R.Civ.P. 37(a). (Doc. 73).   On September 22, 2011, Plaintiff filed 1-paragraph Motion for an Order to

---

[2]*See Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

Receive Voluntary Interrogatories from Plaintiff's Witnesses.  (Doc. 74).  On September 22,

2011, Plaintiff filed 1-paragraph Motion for Leave to Depose Defendant's Superior Officer

pursuant to Fed.R.Civ.P. 45(d). (Doc. 75).

On October 14, 2011, we issued a Memorandum and the following Order:

> Defendant is directed to respond to Plaintiff's **Doc. 73** Motion to Compel
> **within 10 days** of the date of this Order.  **IT IS ALSO ORDERED THAT**
> Plaintiff's Motion for an Order to Receive Voluntary Interrogatories from
> Plaintiff's Witnesses  **(Doc. 74)** is **DENIED.   IT IS FURTHER  ORDERED
> THAT** Plaintiff's Motion for Leave to Depose Defendant's Superior Officer
> pursuant to Fed.R.Civ.P. 45(d) **(Doc. 75)** is **DENIED.**

 (Doc. 81).

On October 24, 2011, Defendant filed her opposition brief to Plaintiff's Motion to

Compel Defendant to respond to his Second Request for Production of Documents with an

attached exhibit, namely, her response to Plaintiff's Second Request for Production of

Documents.  (Docs. 84 and 84-1).

On November 1, 2011, Plaintiff filed a Motion for Preliminary Injunction or a TRO

with Exhibits.  (Doc. 89).  Plaintiff styled his 3-page Motion as a "Memorandum of Law to

Support Reason of Obtaining an (sic) Preliminary Injunction or a TRO on S.I.A. Perrin and

his Staff."  *Id*.    However, since Plaintiff did not file any Injunction Motion, we liberally

construed Plaintiff's Doc. 89 filing as his motion and brief.  On November 2, 2011, we

directed Defendant to respond to Plaintiff's Injunction Motion (Doc. 90), and Defendant

filed her Opposition Brief with Exhibits on November 14, 2011.  (Doc. 93).

On November 16, 2011, we issued a Memorandum and Order and denied Plaintiff's

Doc. 73 Motion to Compel.  (Doc. 94).

On November 18, 2011, we issued a Report and Recommendation on Plaintiff's Motion for Preliminary Injunction or a TRO, recommending that the Court deny Plaintiff 's Injunction Motion.  On January 19, 2012, the Court adopted our Report and Recommendation that the Plaintiff failed to establish elements necessary to obtain a Preliminary Injunction because Plaintiff: (1) failed to make a clear showing that there was a likelihood of success on the merits, or (2) that he will suffer irreparable injury if his motion is denied.  (Doc. 120).

At issue in this Report and Recommendation is the Summary Judgment Motion Defendant filed on December 29, 2011.  **(Doc. 113).**  Defendant also filed her Brief in Support and Statement of Material Facts ("SMF") on January 12, 2012.  (Docs. 118 and 119, respectively).  Defendant also submitted numerous Exhibits, including a copy of the surveillance video (on cd format) from the prison of the March 14, 2009 incident at issue herein which was filed under Seal.   (Docs. 108-109).  We note that Plaintiff viewed the surveillance video as part of the discovery process.  We have also viewed the surveillance video.

On January 12, 2012, at the same time Defendant filed her Brief in Support of her Summary Judgment Motion and her SMF, Plaintiff filed both a Brief in Opposition and hos own Statement of Material Facts requesting that the Court deny Defendant's Summary Judgment Motion.  (Docs. 116 and 117, respectively).  Plaintiff also filed a Supplemental Brief on January 25, 2012. (Doc. 122).   Further, Plaintiff submitted Exhibits.  (Docs. 116-1 and 122). As stated, Plaintiff submitted his own SMF, ¶'s 1-13, which do not address,

paragraph-by-paragraph Defendant's SMF, ¶'s 1-118.  (Doc. 117).  Also, the Local Rules of this Court do not provide that a non-moving party file his own SMF which do  not address, paragraph-by-paragraph, the moving party's SMF.   In any event, we consider and discuss Plaintiff 's evidence he submitted.

On February 13, 2012, Defendant filed a Reply to Plaintiff's Brief in Opposition. (Doc. 123).  Therefore, Defendant's Summary Judgment Motion is ripe for disposition.

As discussed below, we find that the evidence in this case shows that Defendant is entitled to Summary Judgment under Federal Rule of Civil Procedure 56 with respect to Plaintiff's Eighth Amendment excessive force claims against her because there is no genuine issues of material fact in dispute, and because Defendant is entitled to qualified immunity.

## II.  Summary Judgment Standard.

A motion for summary judgment may not be granted unless the moving party is entitled to judgment as a matter of law.  Fed. Rules of Civ. P. 56.  The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact. F.R.C.P. 56( c ).  An issue of fact is "genuine" only if a reasonable jury, considering the evidence presented, could find for the non-moving party. *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the movant.  *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982) aff'd. mem. 725 F.2d 667 (3d Cir. 1983).  Upon such a showing, the burden shifts to the

6

non-moving party. *Id.*  The non-moving party is required to go beyond the pleadings and by

affidavits or by "depositions, answers to interrogatories, and admissions on file" designate

"specific facts showing that there is no genuine issue for trial." F.R.C.P. 56(e).  As the Third

Circuit Court stated, "the non-moving party must rebut the motion with facts in the record

and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral

argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *accord*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In determining whether an issue of material fact exists, the court must consider the

evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric*

*Company*, 862 F.2d 56, 59 (3d Cir. 1988).  In doing so, the court must accept the non-

movant's allegations as true and resolve any conflicts in his favor. *Id*. quoting *Gans v. Mundy*,

762 F.2d 338, 340 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985); *Goodman v. Mead*

*Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Moreover, the Third Circuit has indicated that, "although the party opposing

summary judgment is entitled to the 'benefit of all factual inferences in the court's

consideration of a motion for summary judgment, the non-moving party must point to some

evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely

on assertions made in the pleadings, legal memorandum, or oral argument.'" *Goode v. Nash*,

2007 WL 2068365 (3d Cir. 2007) (Non-precedential)(citation omitted).

In *Reynolds v. Federal BOP*, 2010 WL 744127, * 3 (M.D. Pa.), the Court stated:

> Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary
> judgment should be "rendered if the pleadings, the discovery and disclosure

7

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law." *Id.* After reviewing the evidence, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant. *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 357 (3d Cir.2004).

## III. Statement of Material Fact.

The moving party filing a Summary Judgment Motion must file a Statement of Material Facts and the non-moving party is obliged to respond to it paragraph-by-paragraph. A party filing a Statement of Material Facts ("SMF") or an answer to a SMF must be in accordance with the Middle District of Pennsylvania's Local Rule 56.1, M.D. Pa. In *McCoy v. Edwards*, 2009 WL 1794749, * 2 (M.D. Pa. 2009), the Court stated as follows with respect to M.D. Pa. LR 56.1:

> A motion for summary judgment filed pursuant to F.R.C.P. 56, shall be accompanied by a separate, short, and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried. The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph as to which it is contended that there exists a genuine issue to be tried. **Statements of material facts in support of or in opposition to, a motion shall include references to the parts of the record that support the statements. (Emphasis added).** All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

As mentioned above, the non-moving party, in a motion for summary judgment, is required by Local Rule 56.1 to respond in "numbered paragraphs, as to which the moving

party contends there is no genuine issue to be tried." *Id*.  Plaintiff failed to file a proper

paragraph-by-paragraph response to Defendant's 118-paragraph SMF as required by Local

Rule 56.1, M.D. Pa. In fact, Plaintiff filed his Opposition Brief (Doc. 116) and his own 30-

paragraph SMF on the same day, and hours before, Defendant even filed her Summary

Judgment Motion's Support Brief and Statement of Material Facts.  (Docs. 117, 118 and

119, respectively ).  Therefore, it was not even remotely possible for Plaintiff to properly

respond to Defendant's Statement of Material Facts as he did not have a copy of the

document because it was filed after he filed his Statement of Facts and Opposition Brief.

Local Rule 56.1 does not authorize the non-moving party to file his own SMF; rather, it

requires the non-moving party to respond to each paragraph of the moving party's SMF and

to cite to evidence in the record for any SMF which he disputes.  Plaintiff Hall was provided

with a copy of the relevant Local Rules of this Court.  (Doc. 5).

Furthermore, Plaintiff failed to properly respond, in accordance with Local Rule 56.1,

to the Defendant's Statement of Facts in the Supplemental Brief he filed on January 25,

2012.  (Doc. 122).  Therefore, because Plaintiff did not properly respond to Defendant's

Statement of Material Facts and because each one of Defendant 's Statement of Material

Facts is supported by her citation to the record, we agree with Defendant (Doc. 123, pp. 2-

6) that her Statement of Facts numbered 1-118 should be considered as undisputed.  (Doc.

119).  *See Cyrus v. Laino*, Civil No. 08-1085, M.D. Pa.; *Cyrus v. Freynik*, Civil No. 08-2278,

M.D. Pa.; *Michtavi v. Martinez*, 2009 WL 5172962 (M.D. Pa.); *Accolla v. U.S.*, 2009 WL

3625383 (M.D. Pa.), affirmed 2010 WL 763550 (3d Cir.)(Third Circuit found that since

Plaintiff inmate in civil rights action did not properly respond to prison staff Defendants'

statement of facts as required by L.R. 56.1, M.D. Pa., Defendants' statement of facts were

undisputed); *Velentzas v. U.S.A.*, Civil No. 07-1255, M.D. Pa., 2010 WL 3896192 (8-31-

10).  Because of Plaintiff's failure to properly deny Defendant's Statement of Facts, we

accept all Defendant's Statement of Facts, paragraphs 1-118, because they are all

supported by her evidence (Doc. 118 and 119, Exhibits A, 1- 8 and Atts.) and because

Plaintiff has not properly responded to them in accordance with Local Rule 56.1.

In *Hodge v. United States*, 2009 WL 2843332 (M.D. Pa.), the Court found that

Defendants' Statement of Material Facts, which were in accordance with LR 56.1, were

deemed admitted not only because the Plaintiff, an inmate proceeding *pro se*, failed to

follow LR 56.1, but also because the Defendants properly cited to evidence on record and

Defendants' evidence was not disputed by Plaintiff.  *See Hodge* at *13.  The Court stated:

> Plaintiff received a copy and explanation of the Local Rules pursuant to the court's standing practice order for actions by pro se plaintiffs. Examinations of both plaintiff's Answer to Defendants' Statement of Facts and the exhibits plaintiff filed separately reveal that neither filing constitutes the paragraph-by-paragraph response to the moving party's statement of material facts that LR 56.1 plainly requires and of which Plaintiff Hodge had ample notice.  As such, the court will adopt the magistrate judge's recommendation that Defendants' SMF should be deemed admitted under LR 56.1 and his reliance on those facts for the purpose of assessing Defendants' motion for summary judgment.

*Id.*[3]

---

[3] *See also Barthalow v. David H. Martin Excavating, Inc.,* 2007 WL 2207897 (M.D. Pa.); *Dusenberry v. United States*, 2006 WL 218220 (M.D. Pa.); *Valentzas v. U.S.A., supra*.

Further, we have reviewed Paragraphs 1-118 of Defendant's Statement of Material Facts, and all of the facts stated therein are accurately supported by reference to her evidence contained in her attached exhibits.  (Doc. 119, Paragraphs 1-118, Exhibits 3, 4, 6-8).

We now discuss the  relevant undisputed Statement of Material Facts and evidence Defendant submitted.

The December 21, 2011 Declaration of Dustin Cook, PSY.D., is attached to Defendant's Doc. 118 as Exhibit  3. We note that all of Defendant's Exhibits attached to her Doc. 118 support brief, were also docketed separately as Doc. 118-1.  Plaintiff alleges that he requested medical care for his fingers injured by Defendant on March 14, 2009, and that Dr. Cook refused treatment.   Dr. Cook makes the following undisputed averments:

1.  I am currently employed by the United States Department of Justice, Federal Bureau of Prisons ("FBOP"), as a Drug Abuse Program Coordinator ("DAP-C") at the United States Penitentiary ("USP") Canaan, Waymart, Pennsylvania.  I have been employed with the FBOP since August 2004.

2.  In this capacity I have access to inmate Central Files, Medical records, disciplinary reports, inmate investigations, and other records maintained in the ordinary course of business by the Federal Bureau of Prisons.

3.  The Plaintiff, inmate Jesus Hall, Federal Register Number 32938-037, is currently incarcerated at USP Lewisburg, Lewisburg, Pennsylvania.

4.  In his complaint, the Plaintiff alleges that on March 14, 2009, he placed his hands in the food slot of his cell in the institution's Special Housing Unit ("SHU") to prevent its closing as a way to protest lack of access to the law library and something that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was holding his slot open and that he then put his arm into the slot with his hands on the metal wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and "intentionally slammed the wicket from the outside and pressed her weight onto it to inflict further injury."  As a result of Defendant's conduct, Plaintiff averred that his

11

fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical attention and then she "left the range and stood at the gate laughing with other officer." Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical attention until approximately seven (7) hours later.

5.  On March 14, 2009, I was assigned to work as the Institution Duty Officer ("IDO") at USP Canaan.  The IDO tour is a one-week long rotating post with variable shift assignments and hours.  As IDO, I was responsible for conducting rounds throughout the institution on a daily basis, including the Special Housing Unit, dealing with any visitation issues; conducting inspections of housing units, the Health Services unit, and the dining facility; and responding to all unusual incidents or activities.  At the conclusion of the IDO tour, I was responsible for briefing the incoming IDO and the executive staff.

6.  While making my IDO rounds, it is not uncommon for inmates to speak with me about mental health issues, medication issues, and general Health Services issues since the inmates know that I am a psychologist.

7.  On March 14, 2009, as part of my IDO rounds, I visited the SHU at approximately 1:20 p.m. Prior to entering the range, I was informed that the Plaintiff refused to allow staff to close the food slot ("wicket") in his cell door.

8.  The Special Housing Unit is a secure housing unit within the institution which houses inmates in either an administrative or a disciplinary segregation status.  Since this is a controlled housing unit, inmates are not allowed to control their cell doors or the wickets in the cell doors.  All movement is carefully monitored and controlled.  Inmates are placed in restraints anytime they are removed from their cells.

9.  When an inmate refuses to allow staff to close their wicket, it presents a security hazard because the inmates are able to throw objects from their cell, to reach out and grab staff going by (i.e. to gain control of keys or to injure or assault staff), to grab or assault other inmates passing by their cell, or to attempt to pass contraband to other cells.

10.  When I entered the range, I observed that the Plaintiff's food slot was open. I therefore approached the Plaintiff's cell to discuss the issue with the Plaintiff.

11.  The Plaintiff told me that this behavior was due to not getting to use the legal library as much as he wanted to.  Despite my efforts, the Plaintiff continued to refuse to allow the food slot to be closed and secured.

12.   Shortly after my discussion with the Plaintiff, Case Manager [Defendant] Jamey Koehn entered the range and started making her Unit Team rounds. When Case Manager Koehn approached the Plaintiff's cell, she observed him doing what she reported to me as "stroking his penis with both hands." Case Manager Koehn asked the Plaintiff what he was doing and she closed the food slot.

13.   Shortly thereafter, the Plaintiff reported to me that Case Manager Koehn had slammed his hand in the food slot and that he had two injured fingers.

14.   The Plaintiff showed me his hand and there were no visible injuries.  The Plaintiff continued to report injuries to me, however, there were no visible signs of injury, no swelling observed, and no marks what-so-ever of any type of injury.

15.   As I continued making my rounds, the Plaintiff called me back down to his cell and this time I observed him scratching on his fingers with his fingernails. Even after observing this behavior, the Plaintiff still did not have any observable injuries consistent with having his hand slammed in a food slot.

16.   I then concluded my rounds in the SHU and I departed the unit at approximately 2:20 p.m.

17.   I wrote a Memorandum to the institution's Operations Lieutenant to notify him of this incident (one page) and I attached a copy of it to my Declaration as Attachment #1 [Doc. 118, Ex. 3, Att. 1].

18.   In my Memorandum, I specifically noted that the Plaintiff was alleging that he had been assaulted by Case Manager Koehn and that he had sustained injuries to two fingers.  Based on this report, the Operations Lieutenant was then required to conduct an investigation into the Plaintiff's claims.

19.   On July 12, 2010, I completed an Affidavit as part of an investigation into the Plaintiff's allegations against Case Manager Koehn.  I have attached a copy of the Affidavit (three pages) to my Declaration as Attachment #2 [Doc. 118, Ex. 3, Att. 2].

20.   It is my understanding that the Plaintiff was then given an incident report for violating Bureau of Prisons rules and procedures.  I was not involved in this process.

21.   To the best of my knowledge, I did not have any other involvement in the issues raised by the Plaintiff.

(Doc. 118, Ex. 3).

The December 22, 2011 Declaration of Defendant Case Manager Jamey Koehn is attached to Defendant's Doc. 118 as Exhibit 4. Plaintiff alleges that on March 14, 2009, Defendant intentionally slammed the wicket (food slot) of his cell door on his fingers and pressed her weight into it to cause him injury.    Defendant Koehn makes the following undisputed averments:

> 1.  I am currently employed by the United States Department of Justice, Federal Bureau of Prisons, ("FBOP"), as a Case Manager at the United States Penitentiary ("USP") Canaan, Waymart, Pennsylvania.  I have been employed with the FBOP since February 2005.  Prior to that time, I was employed by the Kansas Department of Corrections as a Correctional Officer and then as a Correctional Counselor from July 1996 through January 2005.
>
> 2.  As a Case Managaer, I have access to inmate Central Files, disciplinary reports, inmate investigations, and other records maintained in the ordinary course of business by the Federal Bureau of Prisons.
>
> 3.  The Plaintiff, inmate Jesus Hall, Federal Register Number32938-037, is currently incarcerated at USP Lewisburg, Lewisburg, Pennsylvania.
>
> 4.  In his complaint, the Plaintiff alleges that on March 14, 2009, he placed his hands in the food slot of his cell in the institution's Special Housing Unit ("SHU") to prevent its closing as a way to protest lack of access to the law library and something that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was holding his slot open and that he then put his arm into the slot with his hands on the metal wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and "intentionally slammed the wicket from the outside and pressed her weight onto it to inflict further injury."  As a result of Defendant's conduct, Plaintiff averred that his fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical attention and then she "left the range and stood at the gate laughing with other officer." Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical attention until approximately seven (7) hours later.

14

5.  Contrary to the Plaintiff's allegation that I asked him why he was holding his food slot open, I deny that I had any conversation with the Plaintiff during or after this incident.  I simply observed the Plaintiff engaging in inappropriate behavior and I instinctively reacted by closing the wicket on his cell door.  Further, I was never informed by the Plaintiff or anyone else as to why the Plaintiff was holding his food slot open until I received a copy of the above-captioned complaint.

6.  When I closed the wicket I clearly observed both of the Plaintiff's hands on his penis.  The Plaintiff did not have any hands or fingers on the wicket as I closed it.  Further, I deny that I became "agitated" and "intentionally slammed the wicket from the outside and pressed [my] weight onto it to inflict further injury."  I also deny that I "smashed" the Plaintiff's fingers.

7.  Finally, I deny that the Plaintiff ever requested medical care for any alleged injuries and that I "left that range and stood at the gate laughing with the other officer."

8.  On March 14, 2009, I was assigned to work as a Case Manager at USP Canaan.  As a Case Manager, I am part of a Unit Team.  As such, I am responsible for conducting periodic inmate reviews to ensure that an inmate is appropriately classified to this institution, that he is working towards completing individualized programming goals (i.e. GED, vocational training, etc.), and that any pre-release preparation is completed.  I am also involved in inmate disciplinary issues as a member of the Unit Disciplinary Committee.  Additionally, I conduct "rounds" in the institution's Special Housing Unit in order to ensure that any of the inmates assigned to Units C and D have access to the services provided by the Unit Team.

9.  Although the Plaintiff was assigned to C Unit, he was not assigned to my caseload but I was familiar with him since he lived in Unit C.

10.  At approximately 1:40 p.m., I was making rounds in SHU.  As I approached the first floor range, I noticed that a wicket (a food slot in a cell door) was open (unsecured) on one of the cells.

11.  It should be noted that the Special Housing Unit is a secure housing unit within the institution which houses inmates in either an administrative or a disciplinary segregation status.  Since this is a controlled housing unit, inmates are not allowed to control their cell doors or the wickets in the cell doors.  All movement is carefully monitored and controlled.  Inmates are placed in restraints anytime they are removed from their cells.

12.  When an inmate refuses to allow staff to close their wicket, this presents a

15

security hazard because the inmates are able to throw objects from their cell, to reach out and grab staff going by (i.e. to gain control of keys or to injure or assault staff), to grab or assault other inmates passing by their cell, or to attempt to pass contraband to other cells.

13.  As stated above, prior to working in the Federal bureau of Prisons, I worked in the Kansas Department of Corrections for almost nine years.  Although the state system also had food slots or "wickets" in the cell doors of their segregation unit, unlike the federal wickets, the state prison system wickets would automatically lock if you pushed them closed.  In the federal system, if you push a wicket closed, you hae to use a key to lock it shut; otherwise, an inmate can push the wicket open again.  The wicket keys are maintained by staff assigned to work in SHU.  As a Case Manager, I am not assigned a key to lock the wickets.

14.  I asked the officer on the floor why a wicket was open and I was told that an inmate was "holding it."  I took this to mean that the inmate was refusing to allow staff to secure the wicket.

15.  I then asked the officer if one of the range officers could come down range with me and secure the wicket.  The officer said he was aware of it and that correctional staff would handle the issue.

16.  I then proceeded onto the C-lower SHU range.  I stopped at a cell and I spoke with an inmate housed in that cell.  I then proceeded down the range towards another cell.  As I approached the cell with the open wicket (which I later discovered was cell number 147), I paid particular attention to the open wicket since it represented a potential risk.

17.  I noticed that there was a mirror propped up in the far corner of the open wicket.  It is my experience that inmates will use mirrors to see who is walking on the range, especially if the staff member is female.  The mirror was facing me as I approached the cell.

18.  As I passed by the cell, I looked in through the wicket and I observed the Plaintiff squatting on the floor with his jumpsuit unbuttoned and his penis fully exposed.  Both of the Plaintiff's hands were rubbing his exposed penis as he made eye contact with me in the mirror.

19.  I instinctively reacted to this sight by lifting the wicket door up and closing it.  Since I did not have a key to secure the wicket, the wicket remained unlocked.

20.  I then went to another cell further down the range and I spoke with another

16

inmate.  When my conversation ended, I departed the range without further incident.

21.  It should be noted that the institution's Drug Abuse Program Coordinator Doctor Dustin Cook was on the range when this incident occurred.  He had asked me what was happening and I told him that the Plaintiff was "jacking off."

22.  As I exited the range, I notified the SHU staff that the Plaintiff was masturbating and that I was going to write an incident report.

23.  I then notified the Operations Lieutenant and the Activities Lieutenant of the incident.

24.  I then proceeded to my office and I started to prepare an incident report charging the Plaintiff with committing a code 205 violation ("Engaging in a Sexual Act") of the Bureau of Prisons disciplinary code.  I have attached a copy of my incident report (one page) to the declaration as Attachment #1 [Doc. 118, Ex. 4, Att. 1].

25.  At approximately 2:50 p.m., Officer Anthony Ferraro called me in my office.  Officer Ferraro was working in SHU and he told me that the Plaintiff had asked for someone to tell me that if I wouldn't write an incident report against the Plaintiff, that the Plaintiff would not file on me.  I took this to mean that Plaintiff was threatening to file false allegations against me unless I decided to drop any disciplinary actions.  Based on this conversation, I prepared a memorandum detailing the incident in SHU.  I have attached a copy of this memorandum (one page) to my declaration as Attachment #2 [Doc. 118, Ex. 4, Att. 2].

26.  I wrote a second memorandum regarding Officer Ferraro's telephone call.  I have attached a copy of this second memorandum (one page) to my declaration as Attachment #3 [Doc. 118, Ex. 4, Att. 3].

27.  On July 8, 2010, I completed an affidavit was part of an investigation into the Plaintiff's allegations against me.  I have attached a copy of the affidavit (three pages) to my declaration as Attachment #4 [Doc. 118, Ex. 4, Att. 4].

28.  While preparing my response to this action, I reviewed a copy of a videotape of this incident.  My review reveals that the videotape supports my assertion that I did not assault the Plaintiff at any time.

29.  To the best of my knowledge, I did not have any other involvement in the issues raised by the Plaintiff.

17

(Exhibit "4").

Defendant also submitted the Declaration of Lieutenant Richard A. Brassard and it is attached to Doc. 118 as  Exhibit 6.  Lt. Brassard avers as follows:

1.  I am currently employed by the United States Department of Justice, Federal Bureau of Prisons ("FBOP"), as a Lieutenant at the United States Penitentiary ("USP") Canaan, Waymart, Pennsylvania.  I have been employed with FBOP since September 1993.

2.  In this capacity I have access to inmate Central Files, Medical Records, disciplinary reports, inmate investigations, and other records maintained in the ordinary course of business by the Federal Bureau of Prisons.

3.  The Plaintiff, inmate Jesus Hall, Federal Register Number 32938-037, is currently incarcerated at USP Lewisburg, Lewisburg, Pennsylvania.

4.  In his complaint, the Plaintiff alleges that on March 14, 2009, he placed his hands in the food slot of his cell in the institution's Special Housing Unit ("SHU") to prevent its closing as a way to protest lack of access to the law library and something that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was holding his slot open and that he then put his arm into the slot with his hands on the metal wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and "intentionally slammed the wicket from the outside and pressed her weight onto it to inflict further injury."  As a result of Defendant's conduct, Plaintiff averred that his fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical attention and then she "left the range and stood at the gate laughing with other officer." Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical attention until approximately seven (7) hours later.

5.  On March 14, 2009, I was assigned to work as the Activities Lieutenant from 2:00 p.m. until 10:00 p.m. Additionally, I note that I also worked that day from 10:00 a.m. until 2:00 p.m. to help cover a vacant post.

6.  As an Activities Lieutenant, I was responsible for ensuring that all correctional posts have been filled per the roster; that all inmate activities are running properly (i.e. chapel, gymnasium, passive recreation; and ensuring that the general inmate

population is fed.  I also monitor the inmate counts, conduct rounds (welfare checks) in all of the inmate housing units, and assist the Operations Lieutenant as directed.

7.  At approximately 2:30 p.m., I went to the SHU to see the Plaintiff because I was told that he was holding his arm through the cell door food slot (thereby keeping it open) and that he was not allowing the officers to secure it.

8.  The Special Housing Unit is a secure housing unit within the institution which houses inmates in either an administrative or a disciplinary segregation status. Since this is a controlled housing unit, inmates are not allowed to control their cell doors or the wickets in the cell doors.  All movement is carefully monitored and controlled.  Inmates are placed in restraints anytime they are removed from their cells.

9.  When an inmate refuses to allow staff to close their wicket, this presents a security hazard because the inmates are able to throw objects from their cell, to reach out and grab staff going by (i.e. to gain control of keys or to injure or assault staff), to grab or assault other inmates passing by their cell, or to attempt to pass contraband to other cells.

10.  When I arrived at SHU, I found the Plaintiff was in his assigned cell (cell number 147) with foot slot secured (closed).  It should be noted that only staff can secure the food slot door and it must be done with a key.

11.  I asked the Plaintiff what happened and he stated that the Case Manager shut his fingers in the food slot (wicket).

12.  The Plaintiff showed me his hands through the cell door window and all I could see was some black marks on the top side of his left hand middle and ring finger.

13.  These marks appeared faint and almost as if the Plaintiff had colored them in with a pencil or pressed down on the rim edge of his bunk.

14.  I told the Plaintiff that I would be back later.

15.  Sometime later, I discussed this issue with the Operations Lieutenant (John Caraluzzi).  Lieutenant Caraluzzi asked me if I had taken any photographs of the Plaintiff and I told him "no".  Lieutenant Caraluzzi then directed me to go back to SHU and take photographs of the Plaintiff's hand.

16. When I returned to SHU to photograph the Plaintiff's hand at approximately 8:58 p.m., the two marks I had seen previously were now torn open and bleeding. These marks almost appeared as if the Plaintiff had dug them open with his fingernails.

17. I then took four (4) photographs: one of the Plaintiff from the waist up; two of the Plaintiff's left hand; and one of both of the Plaintiff's hands. I then presented the photographs to Lieutenant Caraluzzi. I have attached copies of the four photographs to my declaration as Attachment #1 [Doc. 118, Ex. 6, Att. 1].

18. I also wrote a memorandum regarding this incident (one page) and I have attached a copy of it to my declaration as Attachment #2 [Doc. 118, Ex. 6, Att. 2].

19. Lieutenant Caraluzzi and I discussed the photographs and he stated that the injuries in the photographs were a lot worse than when he saw them at approximately 4:25 p.m. that day. I agreed with Lieutenant Caraluzzi that the injuries did look worse than they had looked earlier that day.

20. I also note that approximately 8:55 p.m. on that date, I delivered a copy of an incident report to the Plaintiff. Specifically, the Plaintiff had been charged by Senior Officer Jeremy Dominick with a code 306 (Refusing Programs) and a code 307 violation (Refusing to obey a Direct Order) of the Bureau of Prisons' disciplinary code. I also conducted an investigation into the incident report.

21. To the best of my knowledge, I did not have any other involvement in the issues raised by the Plaintiff.

The Declaration of Lieutenant John Caraluzzi is attached to Doc. 118 as Exhibit 7.

Lt. Caraluzzi avers as follows:

1. I am currently employed by the United States Department of Justice, Federal Bureau of Prisons ("FBOP"), as a Lieutenant at the United States Penitentiary ("USP") Canaan, Waymart, Pennsylvania. I have been employed with the FBOP since June 1991.

2. In this capacity I have access to inmate Central Files, Medical Records, disciplinary reports, inmate investigations, and other records maintained in the ordinary course of business by the Federal Bureau of Prisons.

3. The Plaintiff, inmate Jesus Hall, Federal Register Number 32938-037, is

currently incarcerated at USP Lewisburg, Lewisburg, Pennsylvania.

4.  In his complaint, the Plaintiff alleges that on March 14, 2009, he placed his hands in the food slot of his cell in the institution's Special Housing Unit ("SHU") to prevent its closing as a way to protest lack of access to the law library and something that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was holding his slot open and that he then put his arm into the slot with his hands on the metal wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and "intentionally slammed the wicket from the outside and pressed her weight onto it to inflict further injury."  As a result of Defendant's conduct, Plaintiff averred that his fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical attention and then she "left the range and stood at the gate laughing with other officer." Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical attention until approximately seven (7) hours later.

5.  On March 14, 2009, I was assigned to work as the Operations Lieutenant from 8:00 p.m. until 4:00 p.m. Additionally, I note that I also worked that day from 4:00 a.m. until midnight to help cover a vacant post.

6.  As the Operations Lieutenant, I was responsible for supervising Correctional Services staff and ensuring the safe, secure, and orderly operation of the institution.  To assist me in these duties, I had an Activities Lieutenant.

7.  At approximately 4:10 p.m., I received a telephone call from the SHU Number One Officer stating that the inmates in cell number 154 had covered their cell door window and were not answering the correctional officers that were conducting the afternoon count.

8.  As I was walking down the first floor range in SHU, I noticed that an officer was standing at cell number 154 talking with both inmates.  I also noticed that the covering on the cell door was down.

9.  As I approached the cell, both inmates met me at the cell door and stated to me that they covered their cell door window and were not responding until the Lieutenant came to SHU to speak with them.

10.  I asked them why they covered their cell door window and they stated it was because Case Manager Koehn had assaulted the Plaintiff by slamming the food tray on his hand and they were afraid that staff were going to assault them.

11.  I told both inmates that I would speak with the Plaintiff.  I also told them that they could not cover their cell door window any more.  Both inmates complied.

12.  At approximately 4:20 p.m., I spoke with the Plaintiff at his cell (cell number 147).  The Plaintiff states that when Case Manager Koehn was making her rounds, she saw that the Plaintiff's wicket was open.  Case Manager Koehn asked the Plaintiff why he had the wicket open and the Plaintiff told her it was none of her business.  Case Manager Koehn then got pissed off and slammed the wicket on the Plaintiff's fingers.  The Plaintiff also said that I should check the cameras and I would see.

13.  The Plaintiff then stated that he wanted my name, he wanted Case Manager Koehn fired, and that he was going to sue for his injuries.

14.  I informed the Plaintiff that I was going to have medical staff come down to SHU and complete an injury assessment and to take photographs of his hand.

15.  I then asked the Plaintiff to show me how his hand was on the wicket and how Case Manager Koehn shut the wicket door.

16.  The Plaintiff then placed his hand in the wicket with his PALMS UP.  I asked the Plaintiff if the way his hands were now are the way they were when Case Manager Koehn was at his door.  The Plaintiff stated "yes".

17.  It should be noted that if the Plaintiff's hand was the way he said the injuries would have been on the bottom of his hand and not on his fingertips.

18.  As I was talking to the Plaintiff, I noticed he had one small area of bruising on two of his fingers and I noticed blood.

19.  After leaving SHU, I spoke with medical staff and informed them to go to SHU and complete a medical assessment on the Plaintiff.

20.  I also directed Lieutenant Richard Brassard (the Activities Lieutenant) to take photographs of the Plaintiff.

21.  Sometime later, I discussed this issue with Lieutenant Brassard and he showed me the photographs he had taken of the Plaintiff. I stated that the injuries in the photographs were a lot worse than when I saw them at approximately 4:25 p.m. that day.  Lieutenant Brassard agreed with me.

22.  I also wrote a memorandum regarding this incident (two pages) and I have

attached a copy of it to my declaration as Attachment #1 [Doc. 118, Ex. 7, Att. 1], although I have redacted the names and federal register numbers of the two inmates that were housed in cell 154.

23.  To the best of my knowledge, I did not have any other involvement in the issues raised by the Plaintiff.

Further, Defendant submitted the Declaration of  Enrique Pabon which is attached

to Doc. 118 as Exhibit 8.  Pabon avers as follows:

1.  I am currently employed by the United States Department of Justice, Federal Bureau of Prisons ("FBOP"), as a Special Investigative Agent ("SIA") at the United States Penitentiary ("USP") Canaan, Waymart, Pennsylvania.  I have been employed with the FBOP since August 1993.

2.  In this capacity I have access to inmate Central Files, Medical Records, disciplinary reports, inmate investigations, and other records maintained in the ordinary course of business by the Federal Bureau of Prisons.

3.  The Plaintiff, inmate Jesus Hall, Federal Register Number 32938-037, is currently incarcerated at USP Lewisburg, Lewisburg, Pennsylvania.

4.  In his complaint, the Plaintiff alleges that on March 14, 2009, he placed his hands in the food slot of his cell in the institution's Special Housing Unit ("SHU") to prevent its closing as a way to protest lack of access to the law library and something that was in his lunch tray.  Plaintiff stated that he was protesting until the lieutenant came to the SHU to speak to him.  Plaintiff averred that Defendant Koehn asked him why he was holding his slot open and that he then put his arm into the slot with his hands on the metal wicket which lifted up.  Plaintiff alleged that Defendant then became agitated and "intentionally slammed the wicket from the outside and pressed her weight onto it to inflict further injury."  As a result of Defendant's conduct, Plaintiff averred that his fingers were smashed.  Further, Plaintiff averred that Defendant heard him ask for medical attention and then she "left the range and stood at the gate laughing with other officer." Plaintiff stated that the incident occurred at 1:30 p.m. and that he did not get medical attention until approximately seven (7) hours later.

5.  On March 16, 2010, then-USP Canaan Warden Ronnie R. Holt notified the Special Investigations Department of allegations of "Physical Abuse of Inmates" against Case Manager Jamey Koehn.  Specifically, the Plaintiff alleged that on March 14, 2009, while he was assigned to the Special Housing Unit at USP

Canaan, Case Manager Koehn slammed the food slot on his fingers.

6.  The complaint was initially referred to the Office of Internal Affairs ("OIA"), Federal Bureau of Prisons, by the Office of the Inspector General for screening and classification.  OIA subsequently deferred the matter locally for investigation and it was assigned OIA Case No. 2010-00385.  I was then assigned to serve as the investigating officer.

7.  As part of my investigation, I spoke with Case manager Jamey Koehn, Drug Abuse Program Coordinator Doctor Dustin Cook, and Senior Officer Specialist Anthony Ferraro.  Each of these individuals then completed sworn affidavits, copies of which are attached to my declaration as Attachment #1 [Doc. 118, Ex. 8, Att. 1].

8.  I also reviewed a copy of a sworn affidavit from the Plaintiff that was taken by F.A. Perrin, Special Investigative Supervisor, on July 12, 2010.  I have attached a copy of this affidavit (two pages) to my declaration as Attachment #2 [Doc. 118, Ex. 8, Att. 2].

9.  I also reviewed four photographs (Attachment #3 [Doc. 118, Ex. 8, Att. 3]), and a staff roster (non-releasable).

10.  I also reviewed a medical assessment form of the Plaintiff.  This form revealed that the Plaintiff was medically assessed at 9:25 p.m., on March 14, 2009.  According to the assessment, the Plaintiff had abrasions and dried blood noted on his 2nd and 3rd fingers, left hand, between the nail bed and the first knuckle.  The Plaintiff displayed good range of motion in all digits.  The Plaintiff did not have any swelling or trauma, which was inconsistent with the type of injury sustained when someone has their fingers slammed by a food slot.  The Plaintiff was advised to was the area with soap and water, and he was issued a packet of bacitracin ointment and Band-Aids to cover the affected areas.  Finally, no injury was noted to the Plaintiff's pinky finger as he initially reported.  I have attached a copy of the clinical encounter to my declaration as Attachment #4 [Doc. 118, Ex. 8, Att. 4].

11. My investigation revealed insufficient evidence to support the Plaintiff's claim that he had been physically abused by Case Manager Jamey Koehn; therefore, the allegation of "Physical Abuse of Inmates" was not sustained.

12.  In responding to this case, I reviewed a copy of a computer disc ("CD") which had been made in response to the Plaintiff's Freedom of Information Request (Request Number 2009-06790) regarding the alleged assault.  I have attached a copy of the cd to my declaration as Attachment #5 [Docs. 108-109].  The cd is

labeled as "SHU C-Lower Range, Cell #147, 3-14-2009, 1:40 p.m." and it contains a copy of a videotape that is approximately 4 minutes and 9 seconds in duration.  The videotape does not have any audio.

13.  A review of this cd reveals:

a.  00:00  Camera view shows C-Lower Range, Special Housing Unit, USP Canaan, on March 14, 2009, at approximately 1:40 p.m.  Dr. Dustin Cook is observed on the left side of the screen standing at a cell door speaking to an inmate in a locked cell.  Dr. Cook was conducting rounds as the Institution Duty Officer at that time.  **Directly behind Dr. Cook is the Plaintiff's cell (cell #147) on the right side of the screen.  The wicket (food slot) is open.  No hands or arms are observed on the wicket.**  Case Manager Koehn is observed at the far end of the frame on the right side.  Case Manager Koehn is observed standing at a cell door and speaking with an inmate in a locked cell.  Case Manager Koehn was conducting rounds for the Unit Team at that time.

b.  00:14  Case Manager Koehn starts walking towards the camera, stopping at another cell to speak with an inmate.

c.  00:27  Case Manager Koehn continues walking towards the camera.

d.  00:33  Case Manager Koehn looks into another cell as she continues to conduct rounds.

e.  00:42  Case Manager Koehn arrives at the Plaintiff's open wicket.  Simultaneously, Dr. Cook starts walking towards the camera as he continues to the next cell.  **Case Manager Koehn looks into the Plaintiff's cell as she is walking past, then she takes a step back and lifts the wicket door shut with her left hand.  No hands or arms are observed on the wicket.**  As she starts to walk away, Case Manager Koehn says something to Dr. Cook over her right shoulder.

f.  00:46  Dr. Cook turns back to the cell door he just departed.

g.  00:50  **As Case Manager Koehn walks towards the cell door she just departed, the wicket is pushed open by the Plaintiff and a mirror is seen in the Plaintiff's**

> **hand.  The mirror is positioned in order to observe Case Manager Koehn as she continues to walk towards the next cell.**

h.  00:51    Case Manager Koehn arrives at the next cell.  Dr. Cook walks toward the camera as he continues conducting rounds.  Dr. Cook briefly glances at cell #147 and continues conducting his rounds.

i.  01:05    **Case Manager Koehn turns and walks away from the camera, passing the Plaintiff's open wicket.** Case Manager Koehn continues to walk toward the grill at the front of the range without incident.

j.  01:21    Case Manager Koehn arrives at the front of the range and waits for the grill to be opened so she can depart the range.

k.  01:29    Dr. Cook passes off camera as he continues to conduct rounds.

l.  01:40    Case Manager Koehn departs from the range.

m.  02:37    Dr. Cook appears on camera, on the right hand side of the screen as he continues to conduct rounds.

n.  04:09    The videotape footage ends as Dr. Cook continues conducting his Institution Duty Officer rounds.

14.  On March 19, 2009, the Plaintiff appeared before the institution's Discipline Hearing Officer ("DHO") regarding the incident report issued by Case Manager Koehn.  Specifically, Case Manager Koehn charged the Plaintiff with a code 205 (Engaging in a Sexual Act) violation of the Bureau of Prisons disciplinary code.

15.  At the conclusion of the hearing, the DHO concluded that the Plaintiff had committed the prohibited act.  As such, the DHO imposed the following sanctions: disallowance of 27 days of Good Conduct Time; 30 days of disciplinary segregation time; 30 days impound of personal property; loss of commissary privileges for 9 months; and the loss of telephone privileges for 9 months.  I have attached a copy of the DHO report (four pages) to my declaration as [Doc. 118] Exhibit 8, Att. #6.

26

> I declare that the attached documents are true and correct copies of records kept in the ordinary course of business by the Federal Bureau of Prisons.  I further declare that the foregoing is true and correct and is given under penalty of perjury pursuant to 28 U.S.C. § 1746.[4]

As stated,  because Plaintiff Hall did not properly respond to the Defendant's Statement of Facts in accordance with Local Rule 56.1, and because Defendant, in accordance with the Local Rule supported all of her Statement of Facts with citation to evidence in the form of Exhibits 3, 4, and 6-8 attached to Defendant's Support Brief and Statement of Facts (Docs. 118 and 119, respectively), Defendant's Statement of Facts are deemed undisputed and, thus, admitted.

**IV. Discussion**.

   *1. Eighth Amendment Excessive Force claim*

Even though the facts are largely undisputed due to Plaintiff's failure to properly respond, in accordance with Local Rule 56.1,  to Defendant's SMF, we will outline reasons why we find no disputes of material fact and why we find Plaintiff failed to make the requisite showing for an Eighth Amendment excessive force claim.   We also consider the evidence Plaintiff has offered.

Initially, we have reviewed the cd of the March 14, 2009 incident filed under seal by Defendant (Docs. 108-109) and find that it is accurately detailed in the Declaration of Enrique Pabon which is attached to Doc. 118 as Exhibit 8 and which is quoted above.

---

[4]We added the emphasis to the above relevant portions  of the Declaration of  Enrique Pabon.

27

Plaintiff submitted a letter to the undersigned on April 6, 2012, stating that he recently reviewed the cd again on March 30, 2012, since he claims that the cd was altered when he first reviewed it.  (Doc. 124).  We have read Plaintiff 's Doc. 124 letter and we do not agree with his version of what the cd depicts.  Rather, we concur with Pabon's description of the cd.  Specifically, we agree with Pabon and find that the cd shows the following in pertinent part:

> e.  00:42      Case Manager Koehn arrives at the Plaintiff's open wicket.  Simultaneously, Dr. Cook starts walking towards the camera as he continues to the next cell.  **Case Manager Koehn looks into the Plaintiff's cell as she is walking past, then she takes a step back and lifts the wicket door shut with her left hand.  No hands or arms are observed on the wicket.**  As she starts to walk away, Case Manager Koehn says something to Dr. Cook over her right shoulder.

> f.  00:46      Dr. Cook turns back to the cell door he just departed.

> g.  00:50      **As Case Manager Koehn walks towards the cell door she just departed, the wicket is pushed open**

**by the Plaintiff and a mirror is seen in the Plaintiff's**

**hand.  The mirror is positioned in order to observe**

**Case Manager Koehn as she continues to walk**

**towards the next cell.**

We further observed from the cd that Defendant did not put her weight into the

wicket door when she closed it and that she did not slam it as Plaintiff has alleged.

Rather, Defendant simply lifts the wicket door shut with her left hand and it does not

appear forceful.  Also, Plaintiff 's fingers of his left hand are not seen to be in the slot at

the time Defendant closed it.

As stated, Plaintiff has submitted evidence, including his Declaration and the

Declarations of other inmates  in the SHU on the day in question (inmates Turner and

Samuel), and he has controverted Defendant's evidence as to whether Defendant

slammed the open wicket (food slot) in his cell door on his fingers of his left hand.  (Doc.

122, Exhibits).  There is no dispute that Defendant was in the SHU at the date and time in

question.  (Doc. 122, p. 49).   Thus, there is a dispute in the record as to whether

Defendant closed the wicket on Plaintiff's finger of his left hand on March 14, 2009.

Plaintiff contends that Defendant did, and Defendant claims that she did not.  Plaintiff's

and Defendant 's respective evidence supports their contentions.  However, the

Defendant, in her Reply Brief, states that this dispute is not material.  (Doc. 123).  The

Defendant states that despite Plaintiff's alleged evidence in the form of affidavits from two

inmates who aver that Defendant did close the wicket on Plaintiff's left hand fingers,

Plaintiff has not made the requisite showing for a constitutional claim of excessive use of

force under the Eight Amendment, and, therefore, Defendant is still entitled to summary

judgment, namely on the ground of the *de minimus* nature of the contact.  *(Id.)*.

In order for Plaintiff to successfully defeat Defendant's Summary Judgment Motion

and to proceed to trial with his Eighth Amendment Excessive Force claim, Plaintiff would

have had to have identified several factors: (1) "the need for the application of force"; (2)

"the relationship between the need and the amount of force that was used"; (3) "the

extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as

reasonably perceived by responsible officials on the basis of facts known to them"; and (5)

"any efforts made to temper the severity of a forceful response." *Brooks v. Kyler*, 204

F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  *See*

*also Bright v. Gillis*, 89 Fed. Appx. 802, 805 (3d Cir. 2004) (Court stated the factors in

establishing an Eighth Amendment excessive force claim against prison staff); *Caldwell v.*

*Luzerne County Correctional Facility Management*, 732 F.Supp. 2d 458, 469 (M.D. Pa.

2010)(citing *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)).

In *Freeman v. Bronski*, 2008 WL 4414725, *4 (M.D. Pa.), the Court elaborated

upon these factors when it stated, "[i]n considering such a claim, the fact-finder must

determine  'whether force was applied in a good-faith effort to maintain or restore

30

discipline, or maliciously and sadistically to cause harm.'" *Brooks v. Kyler*, 204 F.3d 102,

106 (3d Cir. 2000) (quoting *Hudson v. McMillan*, 503 U.S. 1, 7, 112 S.Ct. 995, 117

L.Ed.2d 156 (1992)).

Furthermore, the Third Circuit highlighted the fact that not all tortious conduct

which occurs in prison rises to the level of an Eighth Amendment violation. *Howell v.*

*Cataldi*, 464 F.2d 272, 277 (3d Cir. 1972); *Ostrander v. Horn*, 145 F.Supp.2d 614, 618

(M.D.Pa. 2001)("Not every push or shove, even if it may later seem unnecessary in the

peace of the judge's chambers, violates a prisoner's constitutional rights.")(quoting

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In *Caldwell v. Luzerne County*

*Correctional Facility Management*, 732 F.Supp. 2d at 469, the Court stated:

> The prisoner need not show significant injury to state an excessive use
> of force claim. *Hudson,*503 U.S. at 8, 10,112 S.Ct. 995.However,"[t]hat is
> not to say that every malevolent touch by a prison guard gives rise to a
> federal cause of action. The Eighth Amendment's prohibition of 'cruel and
> unusual' punishments necessarily excludes from constitutional
> recognition *de minimus* uses of physical force, provided that the use of
> force is not of a sort repugnant to the conscience of mankind." *Id.* at 9-10,
> 112 S.Ct. 995 (citations omitted). Further, an inmate who complains of a
> "push or shove" that causes no discernible injury "almost certainly fails to
> state a valid excessive force claim." *Wilkins v. Gaddy,* --- U.S. ----, 130
> S.Ct. 1175, 1178, 175 L.Ed.2d 995 (2010) (citing *Hudson,* 503 U.S. at 9,
> 112 S.Ct. 995).

The Court in *Caldwell,* 732 F.Supp. 2d at 470, also stated:

> With respect to the incident of May 26, 2009, it cannot be said that the
> actions taken by Defendant Officer Bleich on that date rise to the level
> of a constitutional violation. The fact that on that date Defendant Officer
> Bleich punched Caldwell once in the back of the head is not the type of
> condition which rises to the level of an Eighth Amendment violation. *See*
> *Reyes v. Chinnici,* 54 Fed.Appx. 44, 47 (3d Cir.2002) (holding officer's

punch of an inmate was not excessive force);*Brown v. Vaughn,*No. 91-2198, 1992 WL 82310, at \*2 (E.D.Pa. Apr. 13,1992)(granting summary judgment where corrections officer initiated violence by punching plaintiff-inmate once, and pushing, spitting, verbally abusing, and using racial slurs against him). Instead, at best, Caldwell has shown only a *de minimus* use of force by Defendant Officer Bleich. As a result, Defendants' motion to dismiss will be granted as to the claims arising out of the May 26, 2009 incident.

Additionally, courts considering Eighth Amendment excessive force claims have generally held that an isolated, single incident does not amount to a constitutional violation.  See *e.g. Norman v. Taylor*, 25 F.3d 1259, 1262-64 (4th Cir. 1994); *White v. Holmes*, 21 F.3d 277, 280-281 (8th Cir. 1994); *Black Spotted Horse v. Else*, 767 F.2d 516 (8th Cir. 1985); *Ricketts v. Derello*, 574 F.Supp. 645 (E.D.Pa. 1983).

It is clear, in analyzing the case law above in relation to the instant wicket closing incident and in viewing the evidence in a light most favorable to Plaintiff, the undisputed evidence shows that the Plaintiff has not proven the elements necessary to raise an Eighth Amendment claim of Excessive Force, and therefore, summary judgment should be granted.

First, in relation to the first factor ("the need for the application of force"), the only force applied, according to Defendant's Declaration and the undisputed facts Defendant admitted that she closed the wicket but not with Plaintiff 's fingers in it, and that there was a need to do so because the Plaintiff was engaged in a sexual act in violation of prison rules and he was looking at Defendant through a mirror.  (Doc. 118, Exhibit 4, Paragraphs 18-19).

As Defendant averred in her Declaration:

> As I passed by the cell, I looked in through the wicket and I observed the Plaintiff squatting on the floor with his jumpsuit unbuttoned and his penis fully exposed.  Both of the Plaintiff's hands were rubbing his exposed penis as he made eye contact with me in the mirror.  I instinctively reacted to this sight by lifting the wicket door up and closing it."

(Doc. 118, Exhibit 4, Paragraphs 18-19).

Plaintiff himself actually admits that he was squatting behind the door in his Opposition Brief, as he stated, "[i]n the case at issue Hall was squatting behind a secured door. . ." (Doc. 116, p. 8).  Plaintiff also admitted at the DHO hearing that his mirror was propped up in the corner of his cell door's open wicket. (Doc. 118, Ex. 8, Att. 6, p. 3).

Additionally, because an incident report (#1844887) was filed against Plaintiff for his engagement in a sexual act in violation of prison rules, BOP Code 205, disciplinary action was brought against him. The DHO determined that Plaintiff committed the prohibited act, and Plaintiff did not appeal this determination or file a habeas petition under 28 U.S.C. §2241.  The DHO made this determination based on the weight of substantial evidence.  (Doc. 118, Ex. 8, Att. 6).

Secondly, in relation to the "relationship between the need and amount of force used" factor, according to the guidelines provided by the case law discussed, only a *de minimus* use of force, if any at all, was applied by Defendant.  Defendant has presented video evidence and stated in her Declaration that she did not slam the wicket, but rather closed it as a security measure and in reaction to observing the Plaintiff engaged in a sexual act of which the DHO determined he was guilty.  (Doc. 118, Ex. 4).  Regardless of

whether the Plaintiff's own affidavit and the affidavits from other inmates are true that

Defendant "slammed" the wicket on his fingers of his left hand, based on precedent, the

Defendant's act of closing or slamming the wicket is considered *de minimus* because it

resulted in no discernible, if any, injuries.  Plaintiff 's own evidence, namely, a copy of the

medical report for his March 14, 2009 health services clinical visit (Doc. 122, p. 18),

Plaintiff reported pain in his left hand fingertips. The medical assessment was "cut(s)

and/or abrasion(s)."  The disposition was "follow-up at Sick Call as needed."  The "Other"

advise was for Plaintiff "to wash area with soap and water."  Plaintiff was also issued a

packet of bacitracin ointment and band-aids to cover the affected areas."  (*Id*.).

Notwithstanding Plaintiff averments in his Declaration (Doc. 122, p. 16) that he is "still

suffering from this incident and I have lost normal functions in one of my fingers inabling

(sic)  me to do normal exercises I suffer from electrical shocks in my hand again from

nerve damage" and that he loses sleep due to pain, we do not find any medical records to

show that these injuries were caused by the alleged March 14, 2009 incident with the

wicket.  Plaintiff 's evidence shows that he had an EMG and nerve conduction exam by

Dr. Rice on December 14, 2010, and that he had progressive left hand weakness and

gradual decrease in strength over several years due to injury sustained when he struck his

hand off a door and that he had a history of left brachial plexus injury and forearm trauma

due to a 1994 motor vehicle accident.  Dr. Rice found that Plaintiff had atrophy of his

hand and distal forearm muscles.  (Doc. 116-1, Ex. Y).  Dr. Rice's Report does not

indicate that Plaintiff left upper extremity abnormal exam results were the result of the

34

alleged March 14, 2009 wicket incident.

Also, as quoted above, in his Declaration, attached to Doc. 118 as  Exhibit 6, Lt.

Brassard avers, in part,  as follows:

12.   The Plaintiff showed me his hands through the cell door window and all I could see was some black marks on the top side of his left hand middle and ring finger.

13.   These marks appeared faint and almost as if the Plaintiff had colored them in with a pencil or pressed down on the rim edge of his bunk.

14.   I told the Plaintiff that I would be back later.

15.   Sometime later, I discussed this issue with the Operations Lieutenant (John Caraluzzi).  Lieutenant Caraluzzi asked me if I had taken any photographs of the Plaintiff and I told him "no".  Lieutenant Caraluzzi then directed me to go back to SHU and take photographs of the Plaintiff's hand.

16.   When I returned to SHU to photograph the Plaintiff's hand at approximately 8:58 p.m., the two marks I had seen previously were now torn open and bleeding. These marks almost appeared as if the Plaintiff had dug them open with his fingernails.

17.   I then took four (4) photographs: one of the Plaintiff from the waist up; two of the Plaintiff's left hand; and one of both of the Plaintiff's hands.  I then presented the photographs to Lieutenant Caraluzzi.  I have attached copies of the four photographs to my declaration as Attachment #1 [Doc. 118, Ex. 6, Att. 1].

18.   I also wrote a memorandum regarding this incident (one page) and I have attached a copy of it to my declaration as Attachment #2 [Doc. 118, Ex. 6, Att. 2].

19.   Lieutenant Caraluzzi and I discussed the photographs and he stated that the injuries in the photographs were a lot worse than when he saw them at approximately 4:25 p.m. that day.  I agreed with Lieutenant Caraluzzi that the injuries did look worse than they had looked earlier that day.

Lt. Caraluzzi averred that as he was talking to the Plaintiff after the incident, "I

noticed he had one small area of bruising on two of his fingers and I noticed blood."

(Doc. 118, Ex. 7).

As the *Hudson* Court stated, this type of force of closing a wicket is not of the "sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10, 112 S.Ct. 995. *See Caldwell*, *supra*(summary judgment granted where the Corrections Officer initiated violence by punching, pushing, spitting, verbally abusing and using racial slurs against the Plaintiff amounted to only *de minimus* force at best); *Jones v. Pugh*, Civil No. 10-0359, M.D. Pa.

We find that Plaintiff is attempting to show that his pre-existing medical problems with his upper left arm and hand, including nerve damage, which were caused by injuries unrelated to the March 14, 2009 incident with the wicket were permanent damages he suffered from the wicket allegedly closed on his left hand fingers. We find that there is no evidence linking the December 14, 2010 EMG and Nerve Conduction testing Dr. Rice performed on Plaintiff 's left brachial plexus, forearm and hand to the injuries Plaintiff alleges he suffered from the wicket. (Doc. 116-1, p. 22). We do however find that Plaintiff 's medical record of July 15, 2009 regarding the bruising underneath his nailbed on his left ring finger and middle finger and, deformity of his fingernails on his left hand could have been caused by the March 14, 2009 incident with the wicket. (Doc. 116-1, pp. 28-29). The record shows that prison PA-C VanderHey-Wright found that the fingernails on Plaintiff 's left ring finger and left middle finger were partly dislodged from the nailbed. Specifically, it was noted that on Plaintiff 's left ring finger, the "top 1/4 of nail was detached from nailbed and is now growing beyond the

36

nail bed, the remainder of the fingernail is attached to the bed.  Left middle finger is similar but much less nail was detached from the bed."  (*Id.*) However, we find that the record supports Defendant's contention that the injuries to Plaintiff 's left hand fingers were *de minimus*.    The record indicates that Plaintiff 's condition was improving from April 28, 2009, and that the plan of care was simply to cut Plaintiff 's affected nails when they grow a little further out beyond the nailbed.  (*Id.*).   There is nothing in this record to show that Plaintiff suffered the extensive and permanent injuries he alleges as a result of the wicket closing on his fingers.   Indeed, we find that Plaintiff 's medical record of July 15, 2009 regarding the bruising underneath his nailbed on his left ring finger and middle finger (Doc. 116-1, p. 29) is completely consistent with Plaintiff 's medical record of March 14, 2009  (Doc. 122, p. 18), discussed above, which only showed that Plaintiff suffered cuts and/or abrasions to his left hand fingertips.

Third, regarding the extent of the injury factor, Plaintiff claims that he suffered substantial injuries to his left-hand ring, index and pinky fingers, and that these injuries have left him with nerve damage and inability to fully use his left hand.  In his Opposition Brief, Plaintiff states that a "PA Certified (PA-C)" Kenneth Zook opined that Plaintiff's alleged injuries to his left hand fingers noted in his medical record of July 15, 2009, could not have been caused by scratching as Dr. Cook stated, but rather were caused by "blunt force trauma."  (Doc. 116-1, p. 28).  However, upon actually reading the one-sentence opinion report written by Certified Physician Assistant Zook on January 5, 2012, it becomes clear that: (1)  Zook was making an observation based on photos of the alleged

injuries and Plaintiff 's medical record of July 15, 2009, not the alleged injury itself; (2)

Mr. Zook failed to state in his opinion that this type of injury could not be caused by

scratching; and (3) Mr. Zook stated only that the injuries which the  photos  depicted and

which were reported in Plaintiff 's medical record of July 15, 2009, were consistent with

"blunt force trauma in most cases," not necessarily in the case at hand.  (Doc. 116-1,

Exhibit Z, p. 28).  Significantly, PA-C Zook did not state that the injuries depicted in the

photos shown to him by the Plaintiff and reported in Plaintiff 's medical record of July 15,

2009, were serious injuries or that they caused permanent damage as Plaintiff alleges.

*(Id.)*.

Additionally while Plaintiff submits the January 5, 2012 Response of PA-C Zook to

his December 24, 2011 Inmate Request regarding his scheduled surgeries, we do not find

that the surgeries were required to repair any damage from the wicket incident at issue.

(Doc. 116-1, Exhibit Z-2, p. 26).  Rather, the surgeries were clearly related to Plaintiff's

pre-existing and unrelated injuries and conditions, described above in Dr. Rice's Report

(Doc. 116-1, Exhibit Y, pp. 22-23), to fix his injured brachial plexus and to decompress

Plaintiff 's ulnar and median nerves at the C4 locations near Plaintiff's elbow for his ulnar

nerve.    As discussed, we find no evidence establishing any connection between

Plaintiff's  injured brachial plexus and, ulnar and median nerves to the March 14, 2009

wicket incident.  The only injuries which we find that Plaintiff has shown may be related

to the March 14, 2009 wicket incident are to his left hand fingernails as detailed above.

Once again, we find that the injuries to Plaintiff 's fingernails on his left ring finger and left

middle finger which were partly dislodged from the nailbeds, are only *de minimus* injuries.

Furthermore, both Dr. Cook's Declaration and EMT Carl Michko's March 14, 2009 Report, which are undisputed, concluded that Plaintiff had full range of motion ("ROM") in his left hand and fingers and was moving all of his extremities without difficulty, and that Plaintiff's alleged injuries were not what would have resulted if a wicket had actually closed on his hand and fingers. (Docs. 118, Ex. 3 and 122, p. 18, respectively). In his December 21, 2011 Declaration, Dr. Cook (PSY. D.), who examined Plaintiff's left hand immediately after the wicket incident in question occurred, averred that:

> 14.  The Plaintiff showed me his hand and there were no visible injuries. The Plaintiff continued to report injuries to me, however, there were no visible signs of injury, no swelling observed, and no marks what-so-ever of any type of injury.
>
> 15.  As I continued making my rounds, the Plaintiff called me back down to his cell and this time I observed him scratching on his fingers with his fingernails. Even after observing this behavior, the Plaintiff still did not have any observable injuries consistent with having his hand slammed in a food slot [wicket].

(Doc. 118, Exhibit 3, Paragraphs 14-15).

Additionally, a medical report provided by the Plaintiff himself and written by Carl Michko, an EMT who examined the Plaintiff's alleged injuries seven (7) hours after the incident (*i.e.* Plaintiff 's medical record of March 14, 2009, Doc. 122, p. 18), stated, "[i]nmate was ambulating around the cell without difficulty. Appeared to be moving all extremities without difficulty. Abrasions and dried blood noted to the 2nd and 3rd fingers, in the left hand, between the nailbed and first knuckle. Good ROM noted in all digits."

(Doc. 122, Exhibit A-12, p. 18).  Michko also stated that the Plaintiff only had to wash the area with soap and water, and issued Plaintiff with a packet of bacitracin ointment and band-aids.  (*Id*.).

Therefore, we find that Defendant's evidence that Plaintiff suffered only *de minimus* injuries is undisputed and, that the medical personnel involved found no real discernible serious injuries attributable to the incident in question.  We find that Plaintiff's proffered evidence that his injuries caused by the wicket incident were serious and required nerve stimulation and surgeries to relate to Plaintiff 's pre-existing conditions and not to any injury from the incident in question.

Fourth, regarding the extent of the threat of safety to staff and inmates factor, Defendant presented evidence explaining that she closed the wicket as a security measure, while Plaintiff only claims, without supportive evidence, that Defendant closed the wicket to intentionally harm him. In her Declaration, Defendant averred as  follows:

> 12.    When an inmate refuses to allow staff to close their wicket, this presents a security hazard because the inmates are able to throw objects from their cell, to reach out and grab staff going by (i.e. to gain control of keys or to injure or assault staff), to grab or assault other inmates passing by their cell, or to attempt to pass contraband to other cells.

(Doc. 118, Exhibit 4, Paragraph 12).   As discussed above, Defendant's averment was supported by the averments made by prison staff in their Declarations offered as evidence in this case.  (Doc. 118, Exs. 6 & 8, Att. 6).

Lastly, regarding the factor of the efforts made to temper severity of a forceful response, Plaintiff claims that Defendant should have left his wicket open, walked away, and sent a Lieutenant in to take care of the wicket.  Plaintiff points to BOP "Program Statement 5566.06" which discusses confrontation avoidance tactics for staff in contact with inmates.  (Doc. 116-1, pp. 15-20, Ex. X).  However, in her response to Plaintiff's Interrogatory No. 16, Defendant stated that, "[a]lthough I was not assigned to work in the Special Housing Unit on March 14, 2009, staff are required to address violations of the BOP disciplinary code regardless of their duty position or location within the institution." (Doc. 116-1, p. 14, Ex. W 10).  In her SMF, Defendant stated that "[a]s she approached [Plaintiff 's] cell (Cell No. 147), [she] paid particular attention to the open wicket since it represented a potential risk."  (Doc. 119, p. 9, ¶ 50).   Defendant  also saw that a mirror was propped up in the far corner of Plaintiff 's open wicket and that as she passed by Plaintiff 's cell, she "looked in through the wicket and observed [Plaintiff ] squatting on the floor with his jumpsuit unbuttoned and his penis fully exposed" with both of his hands "rubbing his exposed penis as he made eye contact with [her] in the mirror."  (*Id.*, ¶'s 51-54).  Thus, while there may be a dispute as to how Defendant should have handled the open wicket incident in question, we find, as discussed above,  that since Plaintiff did not properly respond to Defendant's Statement of Material Facts, all the stated facts in this document are deemed undisputed and admitted.   *See Accolla, supra*.

We agree with Defendant who states in her brief  that no reasonable jury could find that the *de minimus* force she utilized was of the "sort of force that is repugnant to

the conscience of mankind" in violation of the Eighth Amendment.  (Doc. 118, p. 9,

12)(footnote omitted).  *See Knauss v. Shannon*, 2010 WL 569829, *13.  As such, we find

the *Caldwell* and  *Jones v. Pugh* cases directly on point with our case, and we will

recommend that the Court grant Defendant's Summary Judgment Motion with respect to

Plaintiff's Eighth Amendment Excessive Force claim arising out of the March 14, 2009

wicket incident at USP-Canaan.

    *2.  Qualified Immunity*

    Plaintiff claims that because Defendant has violated his Eighth Amendment

protection from excessive force, Defendant should not receive qualified immunity, and

summary judgment, therefore, cannot be granted on this basis.  (Doc. 116).  Defendant,

on the other hand, claims that Plaintiff has not met the burden of proving the five factors

involved in an Eighth Amendment Excessive Force claim, and that he has not proven that

she committed a constitutional violation in regards to the incident at hand. Defendant

argues that she is entitled to qualified immunity, and, therefore, her  Summary Judgment

Motion should be granted.  (Doc. 118).

    The Court in *Brockington v. City of Philadelphia*, 354 F. Supp.2d 563, 567-68 (E.D.

Pa. 2005), stated as follows:

> The doctrine of qualified immunity provides that "law enforcement
> officers acting within their professional capacity are generally immune from trial
> 'insofar as their conduct does not violate clearly established statutory or
> constitutional rights of which a reasonable person would have known.' " *Wilson v.
> Russo,* 212 F.3d 781, 786 (3d Cir.2000) (quoting *Wilson v. Layne*, 526 U.S. 603,
> 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The qualified immunity defense involves
> a two-step analysis.

First, a court must "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson,* 212 F.3d at 786 (citation omitted). Second, if plaintiff has alleged such a deprivation, a court should "proceed to determine whether that right was clearly established at the time of the alleged violation." *Id.* This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002) (quoting *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). A constitutional right is established if it is sufficiently clear and well-defined so that "a reasonable official would understand that what he is doing violates that right." *Carswell v. Borough of Homestead,* 381 F.3d 235, 242 (3d Cir.2004) (citations omitted). Even if a reasonable official would so understand, the defendant may still be shielded from liability if he made a reasonable mistake as to what the law requires. *Id.* Although it is important to resolve qualified immunity questions at the earliest possible stages of litigation, the importance of resolving qualified immunity questions early "is in tension with the reality that factual disputes often need to be resolved before determining whether defendant's conduct violated a clearly established constitutional right." *Curley v. Klem,* 298 F.3d 271, 277-78 (3d Cir.2002). A decision as to qualified immunity is "premature when there are unresolved   disputes of historical facts relevant to the immunity analysis." *Id.* at 278.

Further, "[g]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Showers v. Spangler,* 182 F.3d 165, 171 (quoting *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1699-1700, 143 L.Ed.2d 818 (1999) and *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed .2d 396 (1982)).

When addressing qualified immunity claims, the court must  proceed in a  two prong analysis.  *Id.; Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997); *see also Rouse v. Plantier,* 182 F.3d 192 (3d Cir.1999) (setting forth the same general standard for analyzing qualified immunity, but in a three step inquiry). First, the court  must determine if the  conduct alleged by the plaintiff violated a clearly established constitutional right.  *Id.; see also Johnson v. Horn,* 150 F.3d 276, 286 (3d Cir.1998). If so, the court must then determine if the unlawfulness of the conduct  would have been apparent to an objectively reasonable official. *Id.* Thus,"whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that 483 U.S. 635, 639, 107 S.Ct. 3034,

97 L.Ed.2d 523 (1987) (citation omitted).

Therefore, "[u]nless plaintiff's allegations state a claim of a violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *P.F. v. Mendres,* 21 F.Supp.2d 476 (D.N.J.1998) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

As thoroughly discussed above, we have found that the undisputed evidence shows that Plaintiff's Eighth Amendment right to protection from excessive force was not violated by Defendant.  Thus, we have found that Plaintiff has not successfully established a violation of his constitutional right.  Therefore, in relation to the first prong of a qualified immunity analysis as described in *Brockington*, we conclude that the conduct alleged by the Plaintiff did not violate a clearly established constitutional right.  As such, it is not necessary to address the second prong in a qualified immunity analysis.  We conclude that because Defendant was a law enforcement officer acting within the scope of her duty and not in violation of Plaintiff 's constitutional right, Defendant's Summary Judgment Motion should be granted.

**V.  Recommendation.**

Based on the foregoing, it is respectfully recommended that the Motion for Summary Judgment of Defendant Koehn (**Doc. 113**) be granted with respect to Plaintiff's sole Eighth Amendment excessive force claim against Defendant regarding the wicket-closing incident.  It is also recommended that Judgment be entered in favor of Defendant Koehn and against Plaintiff Hall.

<u>**s/ Thomas M. Blewitt**</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: June 5, 2012**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESUS O. HALL, | : | CIVIL ACTION NO. **1:CV-10-1172** |
| | : | |
| Plaintiff | : | (Chief Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| J. KOEHN, | : | |
| | : | |
| | : | |
| Defendant | : | |

## <u>NOTICE</u>

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **June 5, 2012.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen (14)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis
of that record.  The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with
instructions.


s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**


**Dated: June 5, 2012**